**2021 UT App 48**

## THE UTAH COURT OF APPEALS

AKB PROPERTIES LLC,
Appellant,
*v.*
RUBBERBALL PRODUCTIONS LLC, MLA PROPERTIES LLC,
AND MARK L. ANDERSEN,
Appellees.

Opinion
No. 20190659-CA
Filed April 15, 2021

Fourth District Court, Provo Department
The Honorable Christine S. Johnson
No. 180400242

Jefferson W. Gross, S. Ian Hiatt, and
J. Adam Sorenson, Attorneys for Appellant

Peter H. Donaldson, Matthew J. Orme, and
Cole Crowther, Attorneys for Appellees

JUDGE DIANA HAGEN authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN M. HARRIS concurred.

HAGEN, Judge:

¶1     In this contract dispute, AKB Properties LLC (AKB) appeals the entry of summary judgment in favor of Rubberball Productions LLC, MLA Properties LLC, and Mark L. Andersen (collectively, the Andersen Parties). AKB contends the district court erred in concluding that there were no genuine issues of material fact regarding an alleged oral modification of an agreement between AKB and the Andersen Parties. We agree. Because more than one reasonable inference can be drawn from the material facts at issue, we reverse and remand.

BACKGROUND

¶2 Alan K. Bailey and Mark L. Andersen (the Owners) created Rubberball Productions LLC (the Company) in the 1990s to specialize in the sale of stock photography. Andersen owned fifty-one percent of the Company, and Bailey owned forty-nine percent. At some point before 2006, the Owners each transferred their respective interests in the Company to individually owned limited liability companies named after their own initials: Andersen's interest went to MLA Properties LLC (MLA), and Bailey's to AKB.

¶3 In 2006, the Company was reorganized with MLA and AKB as its only members, and the parties entered into a written buy-sell agreement (the Agreement), which established a contractual structure for buying out a deceased Owner's interest in the Company. The Agreement contemplated that the Company would take out an insurance policy on the life of each Owner, with the Company paying the premiums and being the designated beneficiary. Upon the death of either Owner, a buyout of MLA's or AKB's respective interest would be accomplished by paying the deceased's estate from the proceeds of the applicable life insurance policy.

¶4 The Agreement provided that the Company was valued at $4,000,000, unless and until a value was "reestablished by the Owners executing a written instrument." After twenty-five months, if no written instrument had set such a purchase price, the purchase price would be "the value which is established by mutual agreement between the buyer and sellers, or if no mutual agreement can be arrived at, . . . [by] an independent qualified appraiser." But if the buyout provision was triggered by an Owner's death, the Agreement provided that "until changed hereafter in a writing by the Company and the Owners," the purchase price "shall be an amount equal to the greater of the amount described" above "or the amount of insurance proceeds available to the Company or the remaining Owners. If no life

insurance proceeds are received by the Company or the remaining Owners, for any reason whatsoever, the purchase price shall be as described" above.

¶5    As intended by the Agreement's buyout provisions, the Company purchased two $2,000,000 life insurance policies, one insuring the life of each of the Owners (the Allianz Policies). The Company paid the premiums and was listed as the beneficiary on both policies. It is undisputed that "the purpose of the Allianz [Policies] was to provide funds whereby the surviving [Owner] would buy out the membership interests of the deceased [Owner]."

¶6    In 2012, the Company purchased two additional $2,000,000 insurance policies, one on the life of each Owner (the Ohio Policies). Neither Ohio Policy named the Company as the beneficiary.[1] It is undisputed that "when the Ohio Policies were acquired in 2012, the purpose of those policies was not to provide funds to purchase the membership interests of a deceased [Owner]"; rather, it was to benefit directly the estate of either Owner upon that Owner's death.

¶7    Bailey passed away in 2016, and his family's trust received the $2,000,000 payout from the Ohio Policy. Shortly after Bailey's death, the estate's trustee contacted Andersen to inquire about the purchase of Bailey's interest in the Company pursuant to the buyout provision of the Agreement. According to Andersen, at some point he informed the trustee that the Owners had agreed to an oral modification of the Agreement in 2015 under which the Owners arranged to allow the Allianz Policies to lapse, with the understanding that the proceeds from the Ohio Policies would accomplish the buyout of a deceased

---

1. The Ohio Policy on Bailey listed the Bailey Family Irrevocable Trust as the beneficiary, and the Ohio Policy on Andersen listed Denise Andersen as the beneficiary.

Owner's interest in the Company (the Oral Modification). Nevertheless, Andersen agreed to engage an appraiser to determine the Company's value as contemplated by the Agreement. After the appraiser completed the valuation, Andersen offered the trustee a buyout amount to resolve the dispute, but the parties were not able to reach a resolution.

¶8    AKB filed a complaint alleging breach of the Agreement, among other claims. The Andersen Parties counterclaimed, seeking a declaratory judgment that the proceeds from the Ohio Policy satisfied the Agreement's buyout provision as altered by the Oral Modification. AKB moved for partial summary judgment on the Andersen Parties' counterclaim arguing that, even if the Oral Modification occurred, it was invalid as a matter of law. The Andersen Parties also moved for summary judgment, seeking declaratory relief on its counterclaim and dismissal of AKB's complaint.

¶9    In support of their cross-motion for summary judgment, the Andersen Parties filed two declarations, one from Andersen and one from the Company's office manager. According to the declarations, the Allianz Policies were due to expire in 2015 and in order to renew the policies the Company would have had to pay premiums that were nearly 1,500 percent higher than before. The office manager and Andersen attest that they discussed the matter with Bailey at a regular biweekly Company meeting in March 2015, at which only Andersen, Bailey, and the office manager were present. At that meeting, according to the declarations, Bailey "suggested replacing the Allianz Policies with the pre-existing personal Ohio Policies, and allowing the Ohio Policies to satisfy [the Agreement's] buyout mechanism." Both Andersen and the office manager attest that the Owners orally agreed to allow the Allianz Policies to lapse and agreed "that the Ohio Policies would be used to satisfy the insurance funded buyout provision of the [Agreement]." In a separate deposition, Andersen acknowledged that, under the alleged Oral Modification, the deceased Owner's beneficiary would receive

the same $2,000,000 life insurance payout from the Ohio Policy that it would have received in any event, even without the Oral Modification, and that the deceased Owner's interest in the Company would transfer to the surviving Owner without any additional compensation.

¶10 No written record exists of the 2015 meeting or the Oral Modification. Andersen described the conversation with Bailey as "pretty brief" and

> pretty casual in that neither one of us felt like it was ever going to be required—needed. I mean, no one thinks—neither one of us thought either one of us was going to die. So there wasn't—you know, we didn't open up the documents and look at them in detail with counsel and—try to understand whether or not the policies worked.

¶11 The district court granted summary judgment in favor of the Andersen Parties. AKB now appeals that judgment.[2]

ISSUE AND STANDARD OF REVIEW

¶12 AKB contends that the district court erred in granting summary judgment to the Andersen Parties because triable issues of material fact remain regarding the existence, terms, and enforceability of the alleged Oral Modification.[3] "Summary

---

2. AKB does not appeal the denial of its motion for partial summary judgment.

3. On appeal, AKB raises a second issue concerning the admissibility of the Andersen Parties' declarations, but recognizes that we need not reach that issue to reverse. Because we agree with AKB that, even assuming the admissibility of the

(continued…)

judgment is appropriate 'if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.'" *Berger v. Ogden Reg'l Med. Ctr.*, 2020 UT App 85, ¶ 16, 469 P.3d 1127 (quoting Utah R. Civ. P. 56(a)). "We review the trial court's conclusions of law for correctness, including its conclusion that there are no material fact issues." *Rusk v. Harstad*, 2017 UT App 27, ¶ 3, 393 P.3d 341 (per curiam) (cleaned up). In doing so, we view "the facts and all reasonable inferences in a light most favorable to the party opposing the motion." *Id.* (cleaned up).

## ANALYSIS

¶13 In this appeal, we must determine whether a reasonable jury could reject the Andersen Parties' claim that the Owners agreed to an Oral Modification altering the Agreement so that the Ohio Policies' proceeds would satisfy the insurance-funded buyout of the deceased Owner's interest in the Company. If so, a genuine dispute of material fact remains for trial. Because we conclude that the evidence could support a reasonable inference that no such Oral Modification occurred, we reverse the district court's ruling granting the Andersen Parties' motion for summary judgment.

¶14 Summary judgment is an important tool of judicial efficiency in district courts because it "allows the parties to pierce the pleadings to determine whether a material issue of fact exists that must be resolved by the factfinder." *Lamb v. B & B Amusements Corp.*, 869 P.2d 926, 928 (Utah 1993). To defeat summary judgment, however, the nonmoving party "is required only to show that there is a material issue of fact" for trial. *Id.*

---

(…continued)
declarations, genuine issues of material fact preclude summary judgment, we do not reach the second issue raised on appeal.

"Affidavits and depositions submitted in support of and in opposition to a motion for summary judgment may be used only to determine whether a material issue of fact exists, not to determine whether one party's case is less persuasive than another's or is not likely to succeed in a trial on the merits." *Id.*

¶15    While "an opponent of a motion for summary judgment must timely file responsive affidavits raising factual issues or risk the trial court's conclusion that there are no factual issues[,] . . . it is not always *required* that the opposing party proffer affidavits in order to avoid judgment against him." *Frisbee v. K & K Constr. Co.*, 676 P.2d 387, 389–90 (Utah 1984) (cleaned up). Where the nonmoving party "submits no documents in opposition, the moving party may be granted summary judgment only if appropriate, that is, if [the moving party] is entitled to judgment as a matter of law." *Id.* at 390 (cleaned up). For example, "[w]here the moving affidavit shows on its face that there is a material issue of fact, summary judgment may not be entered, even if responsive affidavits are not filed." *Id.* Similarly, the moving party is not entitled to summary judgment, even in the absence of a single counter affidavit, if "[v]arious conflicting inferences material to the outcome of the case can be drawn from the facts." *See Goodnow v. Sullivan*, 2002 UT 21, ¶ 13, 44 P.3d 704. When such conflicting inferences exist, the factfinder should be allowed "after hearing all relevant evidence, to draw those inferences which seem most reasonable." *Id.*

¶16    The Utah Supreme Court recently reaffirmed that, even when "the only *direct* evidence" is offered by the moving party, that party is not necessarily entitled to judgment as a matter of law. *See Jones v. Mackey Price Thompson & Ostler*, 2020 UT 25, ¶ 52, 469 P.3d 879. Instead, "*circumstantial* evidence may also be considered." *Id*. In *Jones*, the court reversed a directed verdict dismissing the plaintiff's fraudulent transfer claim because there was a sufficient evidentiary basis on which the jury could have found for the plaintiff. *Id.* ¶ 51. Although the only *direct* evidence

of motive supported the defense's position that the purpose of the transfer was tax avoidance, *id.* ¶ 42, the court held that "there was ample *circumstantial* evidence in the record to support a jury determination (by clear and convincing evidence) that at least one of [the defendant's] motives was to hinder or delay [the plaintiff]," *id.* ¶ 52 (emphasis added). In particular, the court noted that the surrounding circumstances called into question the credibility of the defense witnesses and that a reasonable jury could have discounted their testimony. *Id.* ¶¶ 54–55.

¶17 Similarly, "at the summary judgment stage, the district court must view all facts and reasonable inferences in the light most favorable to the nonmoving party." *Jeppesen v. Bank of Utah*, 2018 UT App 234, ¶ 16, 438 P.3d 81 (cleaned up). Just as in the directed verdict context, this standard effectively precludes summary judgment unless "reasonable jurors, having been properly instructed by the trial court, would be unable to come to any other conclusion." *USA Power, LLC v. PacifiCorp*, 2010 UT 31, ¶ 32, 235 P.3d 749 (cleaned up). If circumstantial evidence supports reasonable conflicting inferences, a triable issue of material fact exists.

¶18 In *Fox v. Allstate Insurance Company*, 453 P.2d 701 (Utah 1969), for instance, our supreme court reversed the district court's summary judgment ruling even though the nonmoving party could not directly refute the facts contained in the moving party's affidavit and deposition testimony. Specifically, the plaintiff testified that he had purchased a boat with cash from a stranger, with no witnesses and without receiving a bill of sale or any other writing documenting the transaction. *Id.* at 386–87. According to the plaintiff, two days after insuring the boat for $2,000, he went alone to Utah Lake where the boat struck a submerged object. *Id.* at 387. He testified that an ensuing windstorm battered the seventeen-foot boat with three- to four-foot waves and the boat could not stay afloat, though he managed to swim safely to shore. *Id.* No sunken boat was ever recovered. *Id.* When the insurance company refused to pay the

claim for the purported loss of the boat, the plaintiff sued and the district court granted his motion for summary judgment. *Id.* at 384.

¶19 The supreme court reversed and remanded the case for trial because the plaintiff's testimony did "not overcome the issue of whether he owned the boat which he insured with the defendant or whether he lost a boat at all." *Id.* at 387. The court noted that, even if the only evidence admitted at a later trial was the plaintiff's deposition, "[t]he issues would be for the jury's determination" and would preclude a directed verdict. *Id.* The mere "fact that the defendant was not able to produce negative evidence would not entitle the plaintiff to win as a matter of law." *Id.* To illustrate this point, the court offered the following example:

> If the law were otherwise, anyone could allege that he ate a mouse which was in a can of pork and beans, and while he might or might not be able to recover on the trial of the action against the canner and distributor of the food, he could win on a motion for summary judgment simply because there could not be a counter affidavit filed saying that there was no mouse in the can. All that a defendant could do in a situation such as is supposed above or in this case would be to rely on circumstantial evidence and the wisdom and honesty and good judgment of the jury to arrive at a correct verdict.

*Id.* at 387–88.

¶20 The instant case presents comparable evidentiary challenges given that Bailey, the only other witness who could dispute the alleged Oral Modification, is deceased. Much like the case of the missing boat or the hypothetical mouse in a can of pork and beans, AKB as the nonmoving party cannot, because of

circumstances outside its control, refute the Andersen Parties' declarations by way of direct evidence.[4] Instead, in this situation, whether there exists a question of material fact that precludes summary judgment depends on whether competing inferences can be reasonably drawn from the circumstantial evidence. *Cf. USA Power*, 2010 UT 31, ¶¶ 56, 65 (holding that in "[a] claim for breach of a confidentiality agreement" and misappropriation of trade secrets a party "cannot always present direct evidence" and that to survive summary judgment, the party must therefore rely on other circumstantial evidence from which a jury could reasonably infer a breach).

¶21    Here, even assuming the Andersen Parties' declarations were admissible, there was more than enough circumstantial evidence to cast doubt on the veracity of those declarations. The district court recognized that the determination of witness credibility falls squarely in the purview of the factfinder, but it nonetheless made findings that no credibility issues existed because Andersen's declaration was consistent with the office manager's declaration; AKB did not offer "any evidence, either through affidavit or otherwise," refuting the content of those declarations; and AKB raised only a "meager inference" that the affiants might be self-interested. The district court's reasoning fails to account for the reasonable inferences that a jury could draw from the circumstantial evidence.

---

4. The circumstances of this case are distinct from a situation in which living witnesses exist who might be able to refute the movant's evidence but the nonmovant has not bothered to seek their input. In that situation, depending on the specific facts and the reasonableness of the inferences that might be drawn from the circumstantial evidence, a nonmovant may not be able to survive summary judgment merely by casting doubt on the movant's direct evidence.

¶22 The Agreement provides a detailed written framework for accomplishing a buyout in the event of an Owner's death and specifies the purchase price "until changed hereafter in a writing by the Company and the Owners." Under the terms of the Agreement, a buyout could not be accomplished through the proceeds of a life insurance policy payable to the deceased Owner's estate because the Agreement specified that the purchase price was the "amount of insurance proceeds *available to the Company or the remaining Owners*" and that, if "no life insurance proceeds are received by the Company or the remaining Owners, for any reason whatsoever, the purchase price shall be" determined as provided in other parts of the Agreement. (Emphasis added.)

¶23 Although the Andersen Parties claimed that these terms were later modified and presented evidence to support that allegation, the record also contains sufficient circumstantial evidence from which the jury could reject the contention that the Oral Modification occurred. Based on the existence of the written Agreement and its express terms, a jury could reasonably infer that the matter was of importance to the Owners and that any modification would have occurred in writing and not in the "brief" and "casual" oral conversation Andersen described. The jury is entitled to weigh the absence of any writing memorializing the alleged Oral Modification in determining whether it occurred. This creates a triable issue of fact.

¶24 The Agreement also reflects the Owners' intent that the deceased Owner's interest would be purchased using insurance proceeds available to either the Company or the surviving Owner. Indeed, the Andersen Parties admitted that the Allianz Policies were in place to satisfy the insurance-funded buyout option in the Agreement and that the Ohio Policies, which named each Owner's respective personal beneficiary rather than the Company, were not purchased for that purpose. Andersen also admitted that the Bailey family trust would have received the proceeds of the Ohio Policy in any event, even without the

Oral Modification. A jury could reasonably conclude that the Owners would not have agreed that, in the event of their own deaths, their interest would be transferred to the surviving Owner, rather than to their heirs, without any additional compensation. The evidence supports a reasonable inference that the Owners would not have given up their contractual rights in this manner and calls into question the credibility of the Andersen Parties' position.

¶25 Finally, a reasonable jury could consider the parties' conduct after Bailey's death in determining whether the Oral Modification occurred. In opposition to the Andersen Parties' motion for summary judgment, AKB pointed to the "fact that Andersen proceeded with the valuation procedure found in [the Agreement] after Bailey's death as if there was no oral agreement satisfying the buy-out provision." Evidence in the record shows that Andersen agreed to the trustee's request to have an independent appraiser assess the value of the Company, as the Agreement required in the event that "no life insurance proceeds are received by the Company or the remaining Owners." Following that appraisal, Andersen presented a buyout offer to the trustee, but the parties did not reach an agreement. While Andersen's willingness to engage in negotiations is not incompatible with his declaration that he believed and asserted that the buyout provision had been satisfied, the jury is entitled to weigh this evidence, along with the other surrounding circumstances, in determining whether the facts alleged in the Andersen Parties' declarations were truthful.

¶26 In concluding that no genuine issue of material fact prevented summary judgment, the district court relied heavily on our decision in *JENCO LC v. Perkins Coie LLP*, 2016 UT App 140, 378 P.3d 131. In that case, we noted that "while an appellant who is challenging a summary judgment entered against it is entitled to all favorable inferences, it is not entitled to build a case on the gossamer threads of whimsy, speculation and

conjecture." *Id.* ¶ 15 (cleaned up). But this is not such a case. Based on the circumstantial evidence—including the existence and terms of the written Agreement, the failure to memorialize the alleged Oral Modification, the lack of a plausible explanation as to why the Owners would relinquish their contractual rights, and Andersen's efforts to comply with the Agreement after Bailey's death—a jury might reasonably choose to disbelieve the Andersen Parties' declarations. Because there are triable issues of material fact as to the existence, terms, and enforceability of the alleged Oral Modification, we reverse the district court's judgment in favor of the Andersen Parties.

## CONCLUSION

¶27   The circumstantial evidence in the record creates genuine issues of material fact regarding the Oral Modification, thereby precluding summary judgment. Accordingly, we reverse and remand for further proceedings.

––––––––––––